UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DELRICO OLIVER,

    Plaintiff,

vs.

KARL GREENE,

    Defendant.

Case No. 1:12-cv-371

Magistrate Judge Bowman

**MEMORANDUM OF OPINION AND DECISION**

Plaintiff's complaint was filed pursuant to 42 U.S.C. § 1983, alleging a violation of his constitutional right to be free from excessive force in violation of the Eighth Amendment's Cruel and Unusual Punishment clause against Defendant Karl E. Greene (Greene), then a Youth Specialist in the employ of the Ohio Department of Youth Services ("ODYS"). (Doc. 3, pp. 6-7, § VI, ¶¶ 25-26). Plaintiff's complaint also alleges that Defendants Adam Anderson (Anderson) and Derek Barbee (Barbee), as well as Defendant Waryck (Waryck), exhibited deliberate indifference to his safety needs by failing to protect him from Defendant Greene's alleged actions, also in violation of his Eighth and Fourteenth Amendment rights. *Id.*, p. 7, ¶¶ 27-28.

The parties have consented to the jurisdiction of the United States Magistrate Judge for disposition of this matter. This matter is before the Court on Defendant Greene's motion for summary judgment (Doc. 25) and the parties' responsive memoranda. (Docs. 30, 31). Upon careful review, the undersigned finds that Defendant Greene's motion for summary judgment is not well-taken.

**I.     Facts**

At all times relevant to this action, Plaintiff was incarcerated as a lawfully adjudicated and sentenced juvenile offender under the custody and control of ODYS and was housed at the Ohio River Valley Juvenile Correctional Facility (ORVJCF).[1] In August 2009, Greene began working for ODYS as a Youth Specialist at ORVJCF. (Doc. 25, Ex. 8, p. 2, Q. 2; Ex. 12, p.9, lines 4-14).

Shortly after Greene's hiring and assignment at ORVJCF, Plaintiff claimed that Greene attempted to bribe him with contraband in order to obtain Plaintiff's "help in keeping certain youth on Greene's unit under control." (Doc. 3, p. 3, § V., ¶ 11). According to Plaintiff, he refused the offer and reported the incident to his Unit Manager. Upon investigation, Greene was cleared of any wrongdoing. (Doc. 25, Ex. 12, p. 37:15-24, p. 38:1-16).

In January 2010, Plaintiff claims that Greene "forced Plaintiff to the ground using an unauthorized chokehold technique; Greene without cause or necessity, repeatedly struck Plaintiff's head on the ground, and then purposefully ruptured a preexisting injury on Plaintiff's right hand which then required immediate hospital treatment." (See Doc. 3, p. 3-4, § V, ¶ 11). Plaintiff's allegations were investigated by the Chief Inspector's Office and Greene was found not guilty of any wrongdoing. (Doc. 25, Ex. 2, p. 6, ¶ 4). (finding the allegations unsubstantiated).

On February 8, 2011, Plaintiff claims that "Greene purposefully and without

---

[1] Plaintiff was released from ODYS confinement on his twenty-first birthday on November 24, 2011. (Doc. 4, p. 5, ¶ 1). Recently, on October 2, 2013, Plaintiff was admitted to the custody and control of the Ohio Department of Rehabilitation and Correction (ODRC) where he is currently housed at the Noble Correctional Institution.

2

cause slammed a heavy steel door on Plaintiff's right arm, and then applied his full body weight to the door for over a minute before freeing Plaintiff's arm." (Doc. 3, p. 4, ¶11). This allegation was also investigated and found to be untruthful based upon a review of video recordings. (Doc. 25, Ex. 12, p. 36:9-24, p. 37:1-3; Ex. 10, p. 29:20-24, p. 30:1-24, p. 31:1-13, p. 32:18-21; Ex. 2, p. 6, ¶ 4; Ex. 2-A, p. 1-14 (finding that "The video camera shows that the youth's arm was not smashed by Mr. Greene.") (*Id.*, p. 13).

Thereafter, on December 20, 2010, due to the tumultuous relationship between Plaintiff and Greene, Unit Manager Michael Waryck put in place a Safety Management Plan (Safety Plan). (Doc. 3, p. 4, ¶ 12; Ex. 2, p. 6, 73-76; Ex. 10, p. 170-171). The Safety Plan created an expectation that Plaintiff would "have to talk to other youth specialists. [And] Mr. Greene will have to have the other youth specialists deal with him." (Waryck Dep. 23:21-24). Explaining how safety plans work, Waryck testified: "Hopefully, the youth would utilize his plan and talk to the other officers, and…the officer [who is the subject of the safety plan] would also let the other officers do the work of dealing with him [the youth]. That's how that plan was created, or that's how it should be utilized in that situation." (*Id.* at 52:20–53:6). The Safety Plan also specifically permitted Plaintiff to "self-seclude" by simply going to his room. (Doc. 3, p. 4, ¶ 12).

On February 10, 2011, Plaintiff approached Waryck and expressed concerns about Greene. (Waryck dep., p. 61:6-24, p. 62:1-9, p. 65:8-24; Doc. 25,Ex. 2, p. 45). At the time of this meeting in Waryck's office, Plaintiff was appropriately dressed.

Shortly after his meeting with Waryck, at approximately 4:15 P.M., Barbee issued Plaintiff a Youth Intervention Behavior Report (YBIR) for using offensive language.

3

(Doc. 25, Ex. 2, p. 68; Ex. 11, p. 21:22-24, p. 22:1-3).  Thereafter, Greene issued Plaintiff a second YBIR for violating the Dress Code (his shirt was untucked).  (Doc. 25, Ex.2, p. 69; Ex. 11, p. 22:4-8; Ex. 12, p. 42:1-6).

The video evidence shows that Plaintiff went to the podium and signed the YBIR(s).  He then stayed at the podium talking animatedly to Greene.  Thereafter, Plaintiff walked to his room, put on his tennis shoes and returned to the podium unsolicited by Defendant Greene.  (Doc. 25, Ex. 1-A, 1- B, and 1-C; Ex. 10, p. 113-122; Ex. 12, p. 41-43; Ex. 13, p. 31-33; Ex. 2, p. 5, 8, 15, 19-20, 27, 32, 33).  As Plaintiff returned to the podium, he puts his hands up in the surrender position.  The video surveillance of the podium shows Plaintiff aggressively approaching Defendants Greene, Anderson, Barbee and Waryck as they, in turn, form a semi-circle around Plaintiff in an attempt to confine Plaintiff.  Defendant Greene then extended his arm into Plaintiff as he approached.  Plaintiff swiped Defendant Greene's hand away.  (Doc. 25, Ex. 2, p. 21; Defendant's Ex.1-B at 17:17:14).  Plaintiff then appears to back away from Defendant Greene.  (Doc. 25, Ex. 2 at p. 7).  Defendant Greene advances toward Plaintiff.  Waryck attempted to separate Plaintiff and Defendant Greene and instructed Plaintiff to "lock up" (go to his room) and told Defendant Greene to step back.  (Waryck Dep. At 70-71).

According to Plaintiff's Affidavit, he then pointed at Greene and told him if he was going to do something to just go ahead and do it.  (Doc. 30, Oliver Aff. at ¶18). According to Waryck and other witnesses, Plaintiff attempted to jab and/or punch Defendant Greene.  In response, Defendant Greene grabbed Plaintiff and was trying to

4

take him to the ground.  (Waryck Dep. at 77).  The video shows that Greene had to push Waryck to the side to be able to reach Plaintiff.  Thereafter, an eighty-four (84) second struggle ensued.  (Doc. 25, Ex. 1-C).  According to Plaintiff, he instinctively defended himself by trying to resist what he perceived as an assault by Defendant Greene.

During the struggle on the floor, between 17:17:59, Frame 1642, and 17:18:00, Frame 1646, a period of approximately one second, Defendant Greene can be seen drawing back his left arm on three separate occasions and delivering two distinct blows to the head/facial area of Plaintiff.  (Doc. 25, Ex. 14, p. 6-10).  During this time period, Defendant Greene indicates that Plaintiff bit him twice.  In order to get Plaintiff to release his bite, Greene contends that he delivered the two strikes to Plaintiff's head, and facial area.  Ultimately, with the help of Barbee and Anderson, Plaintiff was taken down to the floor and restrained.

After the incident, Sharon Hylton, a Nurse assigned to the OHRVJC facility examined both Plaintiff and Defendant Greene and took photos of their injuries.  With respect to Defendant Greene, nurse Hylton's examination results indicate that he suffered "a large hemorrhagic bite mark" under his right arm.  John Bradley, M.D., the medical director for the ODYS, reviewed Ms. Hylton's treatment notes and photographs and opined that "the fact that the bite is so pronounced and bleeding even though the bite occurred through a shirt and a 'T' shirt, is evidence of significant trauma that would have come from a bite."  (Doc. 25, Ex. 2 at 24-25).  In addition, Defendant Greene incurred a bruise to his left eye and his cheek.  *Id.*  Plaintiff sustained a bruise to his

5

right eyebrow and superficial scratches to his right wrist and a small abrasion to his third knuckle, presumably on his right hand. (Doc. 25, Ex. 2, p. 9).

An investigation followed. Defendant Greene was initially cleared of the charges brought as a result of Investigator Gillis' Report of Investigation of the incident. (Doc. 25, Ex. 3). However, Superintendent Pigman reversed those findings and recommended a five (5) day suspension for the substantiated charges as found by Investigator Gillis' Report. (Doc. 25, Ex. 4). Ultimately, Superintendent Pigman's five (5) day suspension was reversed and Greene was cleared of all charges, including reimbursement for the five (5) days without pay and his personnel file being cleared of any such discipline. (Doc. 25, Ex. 5).

## II. Procedural History

On May 10, 2012, with the assistance of the ODYS Legal Assistance Program, Plaintiff filed his pro se complaint. (Doc. 3, p. 1, 7, 8). At all times relevant to the allegations in his complaint, specifically the incident on February 10, 2011, while then twenty (20) years of age, Plaintiff was incarcerated as a lawfully adjudicated and sentenced juvenile offender under the custody and control of the ODYS. *Id.*, p. 2, ¶ 5; p. 4-7, ¶¶ 13-26.

Plaintiff's complaint, brought pursuant to 42 U.S.C. § 1983, alleges a violation of his constitutional right to be free from excessive force in violation of the Eighth Amendment's Cruel and Unusual Punishment clause. *Id.*, p.6-7, § VI, ¶¶ 25-26. The complaint also alleges that Defendants Anderson and Barbee, as well as Defendant Waryck, exhibited deliberate indifference to his safety needs by failing to protect him

6

from Defendant Greene's alleged actions, in violation of his Eighth and Fourteenth Amendment rights.[2] *Id.*, p. 7, ¶¶ 27-28. Plaintiff sued all four Defendants solely in their respective individual capacities. *Id.*, p. 2-3, ¶¶ 6-9. The complaint seeks "economic and non-economic damages, punitive damages and the reasonable attorney's fees and costs." *Id.*, p. 2, ¶ 2; p. 7.

Thereafter, Plaintiff asked the Court to appoint counsel. On July 12, 2012 the Court granted the motion, appointing Mr. David Singleton as Plaintiff's Counsel. (Doc. 14). On December 4, 2013, the parties filed a Stipulation of Dismissal with the Court agreeing that Plaintiff's claims against Defendants Anderson, Barbee, and Waryck were dismissed with prejudice. (Doc. 24). Defendant Greene, the sole remaining defendant, now moves for summary judgment.

**III. Analysis**

**A. Standard of Review**

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of

---

[2] Plaintiff does not argue that there was a violation of the Fourteenth Amendment in his brief in opposition to summary judgment. Thus, the Court will address only the Eighth Amendment claim. Regardless, it is clear that the claims cannot be analyzed under both the Eighth and Fourteenth Amendments and that the standards for both are similar in nature. *See Gregg v. Ohio Dept. of Youth Services*, 661 F.2d 842 (S.D. Ohio Sept. 22, 2009).

7

the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.'" *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989) (quoting *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Satterfield v. Tennessee,* 295 F.3d 611, 615 (6th Cir. 2002); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex,* 477 U.S. at 323-24. The moving party need not support its motion with evidence disproving the opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex Corp.,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street*, 886 F.2d at 1479-80. The court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not

8

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Defendant Greene's motion for summary judgment

Defendant Greene maintains that the evidence in this case is so one sided that no reasonable jury could find in favor of Plaintiff. Thus, Defendant asserts that he is entitled to judgment as a matter of law because he acted reasonably under the circumstances. Defendant contends that he properly restrained Plaintiff after Plaintiff engaged in violent and threatening behavior and that he did not engage in excessive force. Defendant further contends that he is entitled to qualified immunity because he acted reasonably. Plaintiff asks the Court to deny Defendant's motion, asserting that genuine issues of material fact exist thereby precluding summary judgment.

### C. Qualified Immunity

The Court must first resolve the issue of whether defendant Greene is entitled to qualified immunity for his actions in this case. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity not only insulates government officials from individual liability for money damages, but from the burdens and expenses of litigation and trial. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001). The doctrine of qualified immunity is intended to balance the following competing interests: "the need to

9

hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). *See also Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). Qualified immunity applies regardless of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson*, 555 U.S. at 231.

Once a defendant raises a qualified immunity defense, the plaintiff must satisfy a two pronged analysis: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right, and (2) if a violation could be made out on a favorable view of the parties' submission, was the right clearly established at the time of the injury? *Saucier v. Katz,* 533 U.S. 194, 201 (2001). In its discretion, the court may initially address either of these questions in light of the circumstances of the particular case before it in resolving an officer's qualified immunity claim. *Pearson,* 555 U.S. at 236-37.

Plaintiff bears the burden of showing that a right is clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). Defendant, however, bears the burden of showing that the challenged actions were objectively reasonable in light of the law existing at the time. *Id.*

In determining whether a right is "clearly established" for purposes of the

10

qualified immunity inquiry, the Court must determine "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Saucier*, 533 U.S. at 202. This question must be answered "in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier,* 533 U.S. at 201). The unlawfulness of the officer's conduct must be apparent in light of pre-existing law. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). "If officials of reasonable competence objectively could disagree on the law, immunity should be recognized." *Cameron v. Seitz,* 38 F.3d 264, 272 (6th Cir. 1994) (citing *Mumford v. Zieba,* 4 F.3d 429, 432 (6th Cir. 1993)).

Summary judgment based on qualified immunity is not appropriate if there is a factual dispute or genuine issue of material fact "involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992).

    **D.**    **Qualified Immunity analysis on Plaintiff's excessive force claim**

    *1. Constitutional Violation*

To decide whether Plaintiff has presented evidence of a violation of his constitutional rights, the Court must first determine the source of the claimed right. *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). Plaintiff's complaint alleges that Defendant Greene subjected him to excessive force by taking him to the ground, choking him and repeatedly punching him in the face. Plaintiff's claims implicate the Eighth Amendment prohibition against "cruel and unusual punishments." U.S. Const.

amend. VIII; *see also Farmer v. Brennan*, 511 U.S. 825 (1994).

To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States and (2) that the deprivation was caused by a person acting under color of state law. *Sigley v. City of Parma Hts.*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Prisoners are protected from the use of excessive force by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). The Eighth Amendment standard focuses on the official's "obdurancy and wantonness" and asks "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 319-21. The test for whether the use of force violates the Eighth Amendment requires a court to determine if the defendant's conduct caused the "unnecessary and wanton infliction of pain." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir.1993) (citation omitted). In other words, [t]o ascertain whether excessive force was used under the Eighth Amendment, the court must determine whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Such a claim has both an objective and a subjective component. The objective component requires that the pain be serious. The subjective component requires that the offending, non-penal conduct be wanton. *Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010) (quoting *Watkins v. Evans*, 1996 WL 499094, at *2 (6th Cir. Sept. 3, 1996)(unpublished)(citations omitted).

For purposes of summary judgment, the Court must accept the Plaintiff's version

of events as true, and must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251-52. "What is necessary to establish an 'unnecessary and wanton infliction of pain [ ]' ... varies according to the nature of the alleged constitutional violation." *Hudson,* 503 U.S. at 5 (citing *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). Where corrections officers are "confronted with a prison disturbance" officers "must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Id.* at 6.

In making the determination as to whether force was excessive under the circumstances, courts are guided by a number of factors, including the inmate's injuries. *Hudson,* 503 U.S. at 7–8. However, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation', or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation omitted). Other factors considered include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.; see also Richmond v. Settles,* 450 F. App'x 448, 453 (6th Cir.2011). As stated by the Sixth Circuit, "[i]n determining whether a prisoner's claim rises to this level [of unnecessary and wanton], the reason or motivation for the conduct, the type and excessiveness of the force used, and the extent of injury inflicted

13

should be considered." *Parrish v. Johnson,* 800 F.2d 600, 604–605 (6th Cir.1986). Courts, however, have been advised that "[t]his analysis ... must be carefully circumscribed to take into account the nature of the prison setting in which the conduct occurs and to prevent a prison official's conduct from being subjected to unreasonable *post hoc* judicial second-guessing." *Id.* (citing *Whitley,* 475 U.S. at 321–22).

As recognized by the United States Supreme Court, "[d]espite the weight of these competing concerns, corrections officials must make their decisions 'in haste, under pressure, and frequently without the luxury of a second chance." *Id.* at 5 (citing *Whitley,* 475 at 320). Accordingly, in determining whether officers used excessive force, courts consider "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6–7 (citations omitted).

In this case, viewing the evidence in the light most favorable to Plaintiff, as required on summary judgment, a reasonable juror could find that Defendant Greene's *initial* use of force was not applied in good faith to maintain or restore discipline. As noted above and as shown on the video, prior to the altercation, Waryck stepped between Plaintiff and Defendant Greene in an attempt to de-escalate the situation. (Doc. 25, Ex.1-B). Waryck then told Defendant Greene to step back away from the area. (Waryck Dep. 70). Despite this directive, Defendant Greene pushed Waryck out of the way in order to grab Plaintiff. Moreover, Barbee and Anderson were also present at the scene at this time. Thus, this evidence suggests that no force was needed to control Plaintiff. To the contrary, the evidence establishes that Waryck told Defendant

14

Greene to back away from Plaintiff.

Once on the ground, Plaintiff alleges that Defendant Greene punched him several times and attempted to choke him. Defendant Greene, however, contends that he punched Plaintiff only after being bitten by Plaintiff several times. The undersigned does not dispute that a jury could determine that Defendant Greene punched Plaintiff in self-defense and/or in an attempt to get Plaintiff restrained after Plaintiff was on the ground.

However, as detailed above, it remains disputed whether Defendant Greene's initial takedown of Plaintiff was applied in good faith or done maliciously to cause harm. In this regard, Plaintiff's own conduct immediately before the officers' use of force is, perhaps, the most significant inquiry. *See Hudson v. McMillian*, 503 U.S. 1, 6–7, 112 S.Ct. 995 (1992) (holding that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"). Plaintiff contends that as he was standing at the podium, he was yelling and pointing at Greene. However, he contends he did not touch Defendant Greene. Witness statements taken during the ODYS investigation of the incident corroborate Plaintiff's assertions. (See Doc. 25, Ex. 2, at p.8, 12, 20, 26, 27, Interviews of Youth D, Youth L and Youth H, Youth T, Barbee, Anderson). Notably, when interviewed by Investigator Gillis, Youth D, stated in relevant part:

Oliver had his arms up in the air and was having words with Green[e]

15

>when UM Waryck stepped between them. Oliver put his hand up, pointed at Green[e] and called him a bitch and Green[e] pushed through Waryck to go after Oliver. After Oliver and Green[e] went to the floor, he saw Green[e] punch Oliver in the face.

*Id.*

Other witness statements and testimony, including that of Defendant Greene, however, indicate that Defendant Greene made contact with Plaintiff only after Plaintiff reached around Waryck and "jabbed" and/or "punched" Greene. (Doc. 25, Ex. 2, Youth L interview, Greene Interview, Waryck Interview; *see also* Doc. 25, *See* Exs. 1-B & 1-C between 17:17:11 and 17:17:26; Ex. 10, p. 69-79, 106-131; Ex. 10-A, p. 23-37; Ex. 11, p. 20-21; Ex. 12, p. 43-44; Ex. 13, p. 33-36; Ex. 2, p. 5-8, p. 13, 15-16, 19-22, p. 27, p. 45-46, p. 56-57, p. 58-59, p. 60-61, p. 67, p. 81, p. 84-85, p. 87, p. 101-102, p. 104-105, p. 108-109, p. 116, p. 117, p. 119, p. 121, p. 125-126).

The Court notes that the credibility of Plaintiff's statements is an issue for the jury, and a jury certainly would be entitled to credit that testimony. The Court cannot assume that a jury would disbelieve Plaintiff unless his testimony is so unbelievable or so discounted by other evidence that a reasonable jury could not believe it. The Court does not find other evidence creating that result in light of the video evidence submitted. Thus, a question of fact remains as to whether or not a constitutional violation occurred.

*2. Clearly Established Right*

The next step of our qualified immunity analysis is whether the alleged violations involved a constitutional right that was clearly established at the time of the alleged misconduct. The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were

16

unconstitutional. *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir.2005). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 943, 848 (6th Cir. 2003). "In an obvious case, general standards can clearly establish the answer, even without a body of relevant case law." *Sample v. Bailey*, 409 F.3d 689, 699 (6th Cir.2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)). "[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional*.*" *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741, 122 S.Ct. 2508. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. Here, a prisoner's right to be free from excessive force amounting to punishment is clearly established law. *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008); *Phelps*, 286 F.3d at 300.

**IV.    Conclusion**

In light of the foregoing, the undersigned finds that there are genuine disputes as to material facts regarding whether Plaintiff's actions created a threat to Defendant Greene and other employees and whether Defendant Greene's initial use of force was

17

reasonable under the circumstances.  Since the issue of whether Plaintiff was the initial aggressor and/or his actions properly provoked the use of force applied by Defendant Greene determines whether Defendant Greene's use of force was objectively reasonable, summary judgment on the basis of qualified immunity is denied.  *Rich*, 955 F.2d at 1095 (Summary judgment based on qualified immunity is not appropriate if there is a factual dispute or genuine issue of material fact "involving an issue on which the question of immunity turns.").

To deny the officers qualified immunity, the Court must deem their use of force under the circumstances objectively unreasonable*.  Fettes v. Hendershot*, 375 F. App'x 528, 533 (6th Cir. 2010).  Factual disputes preclude the Court from making such determination.  As such, Defendant Greene's motion for summary judgment is herein **DENIED** and this matter should proceed to trial.

**IT IS SO ORDERED.**

    *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

18